## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

BRYAN A. EMCH,           )
                              )
          Plaintiff,       )
                              )
vs.                         )    Case No. 4:09CV00807 AGF
                              )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,   )
                              )
          Defendant.     )

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Bryan A. Emch was not disabled and, thus, not entitled to either supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f, or disability insurance payments under Title II of the Social Security Act, 42 U.S.C. §§401-434.  For the reasons set forth below, the decision of the Commissioner shall be reversed and the case be remanded for further proceedings.

Plaintiff, who was born on June 12, 1987, filed for benefits on April 19, 2006, at the age of 18, alleging a disability onset date of January 1, 2006,[1] due to bipolar disorder, Attention-Deficit Hyperactivity Disorder ("ADHD"), depression, and Asperger's syndrome.  After Plaintiff's applications were denied at the initial administrative level, he

---

[1]  Plaintiff originally alleged an onset date of January 1, 1999, but later amended the onset date to January 1, 1997.  (Tr. 92, 96, 105.)  On July 15, 2008, Plaintiff amended the onset date a second time to January 1, 2006.  (Tr. 88.)

requested a hearing before an Administrative Law Judge ("ALJ"), and such a hearing was held on July 15, 2008. By decision dated August 15, 2008, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the non-exertional limitations of work that involved no more than simple tasks, required no more than occasional contact with the general public or co-workers, and took place in an environment that afforded the ability to obtain additional supervision to aid Plaintiff in setting and meeting goals. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on March 26, 2009. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole. Specifically, Plaintiff argues that the ALJ erred in (1) evaluating Plaintiff's RFC, (2) discounting the opinion of Richard Anderson, M.D., Ph.D., Plaintiff's treating psychiatrist, and (3) evaluating Plaintiff's credibility.

## BACKGROUND

### Work History and Application Forms

In his Work Activity Report, Plaintiff represented that he worked part-time at Dairy Queen as counter help from June 2003 through August 2003, earning $5.15 per hour.[2] From July 2004 through October 2005, Plaintiff worked part-time at Steak n'

---

[2] On his Work History Report, Plaintiff indicated that he worked at Dairy Queen as a cashier from May 2001 through August 2001. (Tr. 156-157.)

Shake in production, earning $6.25 per hour.[3]  Plaintiff also reported working part-time at

Denny's Restaurant as a server during July 2005, earning $7.00 per hour.[4]  Finally,

Plaintiff reported working at McDonald's from December 2005 to the present as counter

help, earning $6.58 per hour.[5]  (Tr. 119-29.)

A Wage Information Query report generated on June 18, 2008 indicated that

Plaintiff worked at Ameristar Casino during the 4th quarter of 2006, and reflected

earnings of $960.00.  (Tr. 116.)  Plaintiff submitted a 2007 W-2 from Pizza Hut reflecting

earnings of $1954.00, and a May 2008 paycheck stub from Pizza Hut indicating a pay

rate of $6.65 per hour.  Plaintiff also submitted a 2007 W-2 from Maryland Pizza

reflecting earnings of $2042.64.  (Tr. 232-34.)

**Educational Records**

Following a referral on November 22, 1993, the Educational Services Center

("ESC") of the Pattonville School District conducted psychoeducational testing on

Plaintiff, in response to his ongoing difficulty with his schoolwork and controlling his

behavior.  Results indicated that while Plaintiff's overall cognitive ability fell within the

---

[3]     On his Work History Report, Plaintiff indicated that he worked at Steak n' Shake running a register, preparing food, and unloading trucks from May 2002 through October 2003.  (Tr. 156, 158.)

[4]     On his Work History Report,  Plaintiff indicated that he worked at Denny's Restaurant as a host during June 2003.  (Tr. 156, 159.)

[5]     On his Work History Report,  Plaintiff indicated that he worked at McDonald's as a cashier/cook from December 2005 to the present, earning $6.50 per hour.  (Tr. 156, 160.)

high average range, he had poor reading and comprehension skills, was "careless" in doing mental computation, and displayed "poor planning" skills. Carolyn Niederkorn, an ESC clinician, noted that Plaintiff was bright, and attributed his poor performance to his impulsivity and carelessness. She recommended that Plaintiff receive simple, step-by-step instructions; easy access to support in case of questions; a quiet, distraction-free work environment; frequent breaks; and varied lengths of instructional time. A follow-up evaluation of Plaintiff's activity and attention levels was also recommended. (Tr. 310-13.)

On May 8, 2003, Plaintiff was evaluated for an Individual Education Program ("IEP"). Assessment results indicated that Plaintiff had an IQ of 107, and "average" overall intellectual functioning. His academic achievement was assessed at the 12th grade level, except in spelling, which was below average. The IEP Report summary noted that specific areas of concern were Plaintiff's emotional response to situations, use of objects, adaptability, fear or nervousness, and activity level. The diagnostic team certified that Plaintiff required special education and related services. (Tr. 191-207.)

Between June 21, 2004 and December 14, 2004, Plaintiff was enrolled at the Evangelical Children's Home Society ("Evangelical"), and attended approximately 30-35 individual and group therapy sessions, including Evangelical's Drug Abuse Resistance Education program. During a June 25, 2004 assessment interview, Plaintiff described himself as outgoing, nice, and smart. He reported that he had no trouble making and keeping friends, he liked to make people laugh, and he never missed work. He identified

a wide assortment of interests, including war, weapons, training, and martial arts.  He noted the desire to be a soldier.  Natalie Tosi, M.S., Plaintiff's individual therapist, noted that Plaintiff appeared to have a bright affect and fair mood, but lacked health and weight skills.  She listed problem areas as his fixation on violence and war, and his struggle completing assignments and staying on task.  (Tr. 270-71.)

On June 25, 2004, Plaintiff met with Ms. Tosi for individual therapy and explored his past school behavior, hospitalization for depression, and his goal of returning to public school.  On July 8, 2004, Plaintiff told Ms. Tosi that he was "doing better," and felt less argumentative because of his medication and small class size, but he felt that the work could be more challenging.  Ms. Tosi noted that Plaintiff slept in morning classes, which Plaintiff attributed to working until 10:00 p.m.  (Tr. 293, 297-98.)

On August 23, 2004, Plaintiff suffered several nose bleeds.  He claimed that it was a chronic problem which would also cause lightheadedness, but fought suggestions on how to stop the bleeding.  When contacted, Plaintiff's mother reported his history of self-harm to avoid attending school, and after Plaintiff was told he would not be going home, the bleeding stopped and Plaintiff did not have another nose bleed that day.  (Tr. 289.)

On August 31, 2004, Ms. Tosi noted that Plaintiff appeared tired.  While discussing ways to make his morning routine easier, he complained about having to take the time to shower, and he "shut down" and asked to return to class after Ms. Tosi told him that part of adulthood meant maintaining personal hygiene on his own.  On September 7, 2004, Plaintiff reported to Ms. Tosi that he had found a way to avoid

showering, while still earning "excellent day" ratings.  Ms. Tosi commented on the

amount of time and determination Plaintiff put into trying to manipulate the system and

obtain power, and asked what he was attempting to accomplish.  Plaintiff denied that it

was a power issue, and stated that he did not need to shower as often as others.  (Tr. 288.)

On September 21, 2004, Plaintiff was asleep at a desk when Ms. Tosi arrived to

his individual therapy.  Plaintiff attributed his fatigue to having "a lot on his mind," but

did not want to talk about it.  On September 23, 2004, Plaintiff slept through most of the

group session, claimed he did not feel well, refused to participate, and cursed at the staff.

On September 27, 2004, Plaintiff participated in the group session, but would not follow

directions, was disruptive and destructive, and repeatedly shouted inappropriate

comments towards his classmates.  On September 28, 2004, Plaintiff informed Ms. Tosi

during individual therapy that he slept during the day as a means of avoidance, and they

discussed possible alternate ways to address issues.  (Tr. 283-85.)

On October 7, 2004, Ms. Tosi noted that Plaintiff appeared disheveled and tired.

Plaintiff sat in silence through most of the group session and complained that no one

listened to him.  On October 14, 2009, Plaintiff slept through the first part of a group

session, and required repeated "redirection."  On October 15, 2004, Plaintiff met with

Ms. Tosi, and acknowledged that he had made "inappropriate comments," and that he

slept during class to avoid conflict with a particular teacher.  On October 19, 2004, Ms.

Tosi noted that Plaintiff looked very disheveled, and that Plaintiff stated that he hated

school and should not have to be there.  He reported being angry and described his past as

a "big black hole."  (Tr. 277-78, 280.)  On December 10, 2004, Ms. Tosi noted Plaintiff's offensive tone and defensive behavior.  (Tr. 273.)

An IEP meeting was held on December 17, 2004, and Plaintiff was switched from Evangelical to 90 minutes per week in a special education setting in his home school. The IEP noted that Plaintiff would participate in the SSD "work experience" program, and would utilize a "crisis intervention pass" to see designated personnel when needed. (Tr. 174-88.)  Plaintiff graduated from high school in 2005.  (Tr. 12, 515.)

Between January 14, 2006 and May 15, 2006, Plaintiff was enrolled full-time at St. Louis Community College ("STLCC").  On June 21, 2006, Mary Wagner, the STLCC Disability Support Specialist, completed a Teacher Questionnaire, indicating that she was responsible for arranging academic accommodations for students with disabilities.  Ms. Wagner stated that because she was not a teacher, she could not address any concerns in the questionnaire, other than to note that Plaintiff's Elementary Algebra teacher reported that Plaintiff "didn't come to class very often."  (Tr. 210-20.)

**Medical Records**

On April 24, 2002, James R. Rohrbaugh, M.D., a neurologist, diagnosed Plaintiff with minimal cerebral dysfunction, manifested by Attention Deficit Disorder ("ADD") and oppositional and defiant behaviors.  Dr. Rohrbaugh noted that Plaintiff was moody, irritable, and had decreased eye contact.  He noted that Plaintiff fought with his parents at home, and that, although Plaintiff generally did well in school, he refused to participate in class and acted out when he did poorly.  Dr. Rohrbaugh continued Plaintiff's Concerta

prescription, and replaced his Wellbutrin prescription with Celexa. (Tr. 243-44.)

On July 19, 2002, Dr. Rohrbaugh observed that Plaintiff was less confrontational, but was difficult to engage, and spoke in short, quick phrases. On November 21, 2002, Dr. Rohrbaugh observed that Plaintiff appeared oppositional, curt, short, and angry, and answered everything in the negative. Dr. Rohrbaugh noted that Plaintiff's grades had declined, and his lack of organizational skills led to fighting between Plaintiff and his parents. (Tr. 240-42.)

On February 28, 2003, Dr. Rohrbaugh noted that Plaintiff might suffer from bipolar disorder, and observed that Plaintiff appeared intense and jumped from one topic to another. Plaintiff stated that his medication helped and denied having trouble at school. At Plaintiff's June 13, 2003 visit, Dr. Rohrbaugh again noted the possibility of emerging bipolar disorder or thought disorder, and noted that Plaintiff spoke less about hurting himself, but was more verbally aggressive with his family and teachers. He also noted that Plaintiff's grades continued to decline. Dr. Rohrbaugh replaced Plaintiff's Concerta prescription with Depakote. (Tr. 236-39.)

On July 17, 2003, Richard Anderson, M.D., Ph.D., Plaintiff's psychiatrist, conducted a psychiatric evaluation of Plaintiff. Dr. Anderson assessed Plaintiff as having ADHD; a mood disorder, possibly bipolar disorder; and a possible mild developmental disorder, possibly Asperger's syndrome. Plaintiff's parents stated that he often screamed and cursed at home. Dr. Anderson noted that Plaintiff had been restless, agitated, and provocative towards his teachers and fellow students. Dr. Anderson noted that Plaintiff

demonstrated generally disinhibited behavioral impulses during the mental status exam. Plaintiff had grandiose thoughts; displayed odd, eccentric type styles and mannerisms; had limited judgment and insight; and grossly unremarkable cognition. Plaintiff's speech had a regular rate, his mood was "okay," his affect was full, his psychomotor level was normal, and his flow of thought was logical and sequential. Plaintiff denied suicidal or homicidal thoughts, and did not have auditory or visual hallucinations. Dr. Anderson continued Plaintiff's Depakote and Celexa prescriptions, and restarted Plaintiff on Concerta. (Tr. 468-71.)

On November 18, 2003, Dr. Anderson submitted a letter to Pattonville High School indicating that he had treated Plaintiff for more than a year, and had diagnosed Plaintiff with ADD; a cycling mood disorder, probable bipolar disorder; obsessive spectrum anxiety disorder; and Asperger's syndrome. Dr. Anderson also stated that Plaintiff was under treatment and on psychiatric medications for these conditions. (Tr. 309.)

On April 9, 2004, Dr. Anderson conducted an "urgent" appointment with Plaintiff in response to a letter from Plaintiff's school counselor, Jean Harmon, who expressed extreme concern regarding Plaintiff's behavior. Dr. Anderson ascertained that Plaintiff was in a psychotic state, and was experiencing paranoid delusions, hallucinations, and "formal thought disorder including referential thinking." Dr. Anderson determined that Plaintiff needed acute hospitalization, and immediately admitted Plaintiff to St. Joseph's Health Center for treatment. (Tr. 259.) Dr. Anderson diagnosed Plaintiff with a

"psychotic disorder possibly emerging schizophrenia versus bipolar disorder," ADHD, a developmental disorder, and a Global Assessment of Functioning ("GAF")[6] of 30. (Tr. 260.)

Plaintiff was discharged on April 14, 2004, with a discharge diagnosis of bipolar disorder; ADHD; new onset psychosis, rule out emerging schizophrenia; a developmental disorder; and a GAF of 50. Dr. Anderson determined that Plaintiff was no longer suicidal, homicidal, or psychotic, and while still "somewhat impulsive," was not immediately dangerous. Dr. Anderson also prescribed Seroquel. (Tr. 257-58.)

On May 6, 2004, Plaintiff was again admitted to St. Joseph's Health Center. On admission, Dr. Anderson noted that Plaintiff was "angry, sullen, labile," and prone to unpredictable violent action. Plaintiff's parents indicated that his pattern of behavior had been worsening steadily, his schoolwork had been impacted to the point where he had stopped learning in any effective way, and that he had threatened to harm himself and others. Plaintiff stated that he felt "suicidal because he realize[d] he [wouldn't] be able to join [the] Special Forces." Dr. Anderson diagnosed Plaintiff with bipolar disorder with

---

[6]    A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. GAF scores of 21-30 reflect behavior that is "considerably influenced" by delusions, hallucinations, serious impairment in communication or judgment, or an inability to function in almost all areas; scores of 31-40 indicate "some" impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32-4.

10

psychosis, ADD, Asperger's syndrome, and a GAF of 30. (Tr. 248-49.)

During a Youth Social Services Assessment that day, Plaintiff admitted to briefly using marijuana and occasionally using alcohol. Plaintiff stated that he despised his mother, but had a good relationship with his father and brothers, and claimed that he always presented a facade and never expressed his true feelings. The interviewer assessed him as cooperative, with a sad and depressed mood, and jumbled thoughts. The interviewer recommended group therapy and long-term psychiatric care. (Tr. 254-55.)

Plaintiff was discharged on May 15, 2004, with a diagnosis of bipolar disorder, ADHD, and Asperger's syndrome. Dr. Anderson noted that Plaintiff denied auditory hallucinations, and was not suicidal or homicidal. He also noted a vast improvement in Plaintiff's level of paranoia, and assessed a GAF of 50. Plaintiff was prescribed Abilify, Seroquel, Concerta, Celexa, and Depakote, and Plaintiff's parents were instructed to keep the medication locked up and out of his reach. Dr. Anderson's discharge notes also indicated that Plaintiff was discharged to the Marygrove Respite Care Center for one week, after which time he would go to Evangelical Inpatient. (Tr. 246-56.)

Between February 17, 2005 and December 13, 2007, Plaintiff visited L. Joseph Kennington, M.D., on several occasions for various physical conditions, including cough, sore throat, respiratory infection, bronchitis, ear issues, and chest pain. Dr. Kennington instructed Plaintiff to take over-the-counter and prescription medications, and recommended smoking cessation. On March 3, 2005, Plaintiff saw Dr. Kennington and complained of stiffness in his knees, after falling on ice at work. (Tr. 576-90.)

On August 10, 2005, Plaintiff informed Dr. Anderson that he had been fired from Denny's for tardiness. Plaintiff reported that he slept in a lot when he was not working. Dr. Anderson noted that Plaintiff had decreased energy and was not happy; he was cranky, but not explosive. (Tr. 305.)

On August 24, 2005, Plaintiff completed a Health Assessment Questionnaire and claimed that his disability interfered with his ability to work, because he suffered from deep depression, intense death-related nightmares, self-mutilation, anti-social and aggressive behaviors, and had problems with medication compliance. Plaintiff's parents completed the narrative portion of the Questionnaire, and noted that Plaintiff did little other than sleep, work, or play video games; had been fired from his most recent job for tardiness; had a short attention span; and was both physically and verbally violent towards them. His parents also noted that Plaintiff was hospitalized twice for depression and behavioral problems during his junior year of high school, and spent a semester in a locked school system. Plaintiff listed his medications as including Levoxyl, Concerta, Celexa, Abilify, Seroquel, and Depakote. (Tr. 301-2.)

In a letter dated September 2, 2005, Dr. Anderson stated that he began treating Plaintiff in July 2003, and was currently treating Plaintiff for ADHD and bipolar disorder. He listed Plaintiff's medications as including Concerta, Abilify, and Seroquel. He also noted that in addition to seeing Dr. Anderson every couple of months, Plaintiff was seeing Rick Pearl, a therapist, every other week. (Tr. 303.)

On September 8, 2005, Stephen Starr, a counselor for the Missouri Department of

Education, Division of Vocational Rehabilitation, certified Plaintiff's eligibility for vocational rehabilitational benefits.  (Tr. 300.)

During a March 8, 2006 appointment, Plaintiff informed Dr. Anderson that he was in college, working 15-20 hours per week at McDonald's, and had gotten a concussion from falling down a step at work.  Dr. Anderson noted that Plaintiff seemed "somewhat grandiose, impulsive," and that Plaintiff was not taking his Abilify.  (Tr. 315.)

On May 7, 2006, Plaintiff's mother completed a Third-Party Function Report. Plaintiff's mother stated that Plaintiff spent most of his time at home sleeping or playing video games, no longer had friends or a social life, and refused to interact with his family. She stated that Plaintiff wore dirty clothes, only showered when hounded, did not do laundry or clean up after himself, and when confronted, got angry and left the house. Plaintiff's mother stated that without his medication, Plaintiff's behavioral problems would manifest within 24 hours, and that Plaintiff would not take his pills unless she physically handed them to him and watched him swallow them.  She also stated that Plaintiff needed to be reminded about appointments, or he would not go.  She stated that, generally, he only left the house to go to school, to work, or to smoke, but occasionally he disappeared for long periods of time.  She also states that he spent a lot of time at a knife/cigarette store, and that she regularly found knives in his room, which she threw away.

Plaintiff's mother stated that before his illness, Plaintiff was in the junior high band and on the high school football team; he was active in church, youth group

programs, and Boy Scouts; but he had since dropped all of his activities. She stated that his illness affected his memory, as well as his ability to get along with others, complete tasks, or follow instructions. However, she noted that his attention span varied based upon his desire to cooperate. She stated that he was failing his classes because he did not work or study. She stated that he argued with, and dismissed, supervisors, teachers, and other people of authority, because he felt that he was smarter than anyone else, and that he had lost jobs as a result. Plaintiff's mother stated that he handled stress very poorly. She stated that he needed help with finances because he resented the responsibility of keeping track of them on his own; he refused to deal with paying bills; he did not care about saving money and he spent foolishly, living off of his parents.

Plaintiff's mother stated that his behavior affected the entire family, such that Plaintiff's older brother no longer returned home from college, and his younger brother was afraid of him. She did not believe he could be cared for at home much longer and was investigating alternate living situations. She stated that Plaintiff dreamt about his death nightly, enjoyed trapping the family's cats against their will, and had said that "all he has left is his anger." (Tr. 147-55.)

On May 11, 2006, Plaintiff completed a Function Report in which he stated that when he was not working after school, he did odd jobs at home or relaxed. He stated that he sometimes prepared his own meals, but did so less often than before his illness. He also noted that he now dressed for comfort, not appearance; generally lacked interest; had trouble maintaining good hygiene; and needed reminders to help him with most things,

but noted that he did not need help or reminders to take his medication. Plaintiff added that he now had traumatic nightmares and had developed a fear of needles. Plaintiff stated that he often went out walking, driving, and roller-blading; rarely went shopping, and then only for entertainment items and clothing; and had no trouble handling money, but noted a tendency to spend more when depressed.

Plaintiff listed hiking, fencing, martial arts, warfare, and studies on tactics and equipment, as hobbies he did "often and quite well." He also stated that he hung out with friends and went to the park less often, was less active, played fewer sports, and had less energy than before his illness. Plaintiff stated that he had trouble getting along with his parents, and had been told that he was annoying when he was "trying to grab attention."

Plaintiff indicated that his illness affected his concentration, ability to follow instructions, and ability to complete tasks; he was easily distracted. Plaintiff stated that he was able to follow written instructions, but liked to do things his own way, even if the two conflicted. Plaintiff stated that he did not follow oral instructions well because he argued about what he believed were better ways of doing things, and had been fired because of major arguments with managers. Plaintiff stated that he did not like authority figures who controlled through the use of physical or verbal violence. He added that he bottled up his stress, but handled change well, because he had trouble with a "never changing day-to-day life." (Tr. 164-71.)

On July 7, 2006, Dr. Anderson met with Plaintiff and Plaintiff's mother. Plaintiff's mother stated that Plaintiff was rude, and yelled and screamed when she tried

to awaken him in the morning. Plaintiff indicated that his goals were to work more hours, continue his education, "his girlfriend Jennifer," and to save enough money to move out of his parents' home. (Tr. 316.)

On August 14, 2006, Arthur C. Littleton, Ph.D., conducted a psychiatric evaluation of Plaintiff, based upon a referral of Plaintiff by Emily Gundy, a Disability Determinations Counselor. Dr. Littleton observed that Plaintiff displayed satisfactory hygiene; engaged in conversation; was alert, attentive and cooperative; and was able to follow simple directions. He noted that Plaintiff was taking medicine for depression and delusions, including Citalopram, Levoxyl, Concerta, and Depakote. Plaintiff's mother reported that Plaintiff received psychiatric and psychological intervention. Dr. Littleton noted that Plaintiff's cognitive abilities were at least average, with intact memory, and reasonably good judgment, insight, and comprehension. He also noted that Plaintiff was at times confused, evidenced a sense of grandeur and denial, and presented symptoms that suggested a depressed mood. Dr. Littleton noted that Plaintiff was competent to manage his own financial affairs. Dr. Littleton diagnosed Plaintiff with Schizoaffective disorder, and a GAF of 60. (Tr. 318-21.)

On August 31, 2006, Judith McGee, Ph.D., a non-treating state consultant, conducted a psychiatric review of Plaintiff. Dr. McGee indicated, in check-box format, that Plaintiff's medical disposition was based upon organic mental disorders, and on affective disorders; and noted that ADHD, a mood disorder, schizophrenia, and bipolar disorder were present. Dr. McGee noted that Plaintiff had a mild limitation of activities

of daily living and a moderate limitation maintaining social functioning, concentration, persistence, or pace, but there was insufficient evidence to determine the existence, or extended duration, of repeated episodes of decomposition. She also noted that Plaintiff had been accepted for vocational rehabilitation services for job training, and that Plaintiff retained the ability to do simple work with limited social interaction and some additional supervision. Dr. McGee noted that evidence did not establish the presence of the "C" criteria.[7] (Tr. 322-45.)

---

[7] Under the Commissioner's regulations, an organic disorder such as ADHD, is presumptively disabling if "A" criteria and "B" criteria are met, or if "C" criteria are met. "A" criteria (medical findings) are met if there is a medically documented persistence of disorientation, memory impairment, perceptual or thinking disturbances, change in personality, disturbance in mood, emotional lability, or loss of measured intellectual ability of at least 15 I.Q. points. "B" criteria (functional limitations) are met if there is a marked functional limitation in at least two of the following four categories: (1) daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) repeated episodes of decompensation, each of extended duration. "C" criteria are met if the disorder has been of at least two years duration with either (1) repeated episodes of decompensation, (2) such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or (3) one or more years inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. § 404, Pt. 404, Subpt. P, App. 1 ("Appendix 1"), Listing 12.02.

An affective disorder, such as bipolar disorder, is presumptively disabling if "A" criteria and "B" criteria are met, or if "C" criteria are met. "A" criteria (medical findings) are met if there is a medically documented persistence of a depressive, manic, or bipolar syndrome. "B" criteria (functional limitations) are met if there is a marked functional limitation in at least two of the following four categories: (1) daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) repeated episodes of decompensation, each of extended duration. "C" criteria are met if the disorder has been of at least two years duration with either (1) repeated episodes of decompensation, (2) such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or (3) one or more years inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Id. at Listing 12.04.

Also on August 31, 2006, Dr. McGee completed a Mental RFC assessment of Plaintiff. Dr. McGee determined that Plaintiff was moderately limited in his ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and to respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting. (Tr. 346-51.)

On December 30, 2006, Plaintiff was admitted to St. John's Mercy Medical Center for self-mutilation of his left arm and left cheek, and exacerbation of his bipolar disorder. Plaintiff stated that he had hurt himself to get his parents' attention. Plaintiff admitted to non-compliance with his Depakote. On admission, Eduardo Garcia-Ferrer, M.D., assessed Plaintiff's GAF at 50. Plaintiff's GAF was assessed at 30 later that day. Plaintiff denied homicidal or suicidal ideation. (Tr. 372-465.)

In a family meeting on December 30, 2006, Plaintiff's parents expressed concern regarding Plaintiff's threats of self-harm, and stated that they did not feel safe having

Repeated episodes of decompensation "means three episodes within one year, or an average of once every four months, each lasting for at least two weeks." Id. at Listing 12.00(C)(4).

Plaintiff return home.  Plaintiff's parents also stated they had spoken to an attorney regarding the possibility of obtaining social security benefits for Plaintiff.  During a family meeting on January 1, 2007, Plaintiff became upset and began banging his head against the wall, but stopped when he was told that the behavior might result in a longer hospitalization.  On January 3, 2007, Plaintiff complained about the increase in his Depakote dose, but took the medication, and was found vomiting in his bathroom 30 minutes later.  Plaintiff was discharged on January 4, 2007, with a diagnosis of bipolar disorder, ADD, Asperger's syndrome, hypothyroidism, and a GAF of 55.  (Tr. 372-465.)

On May 10, 2007, Plaintiff was admitted to CenterPointe Hospital after he threatened to take an overdose of pills, and to cut himself.  On admission, his thought content was positive for suicidal ideation and paranoid delusions, with poor judgment and insight.  Plaintiff's admitting diagnosis was bipolar disorder, ADD, Asperger's syndrome, and a GAF of 30.  During Plaintiff's intake assessment, he began yelling and screaming.  Plaintiff stated that he had violent dreams about death and self-mutilation; practiced self-mutilation by cutting and stabbing his arms with a screwdriver; talked about wanting to be dead; and believed everyone was against him.  Plaintiff dislocated his finger during the interview "for fun."  (Tr. 485-96, 507-31.)

In his Comprehensive Intake Assessment, Plaintiff reported that his history of substance abuse included one year of alcohol use, seven years of cannabis use, and a four to five year history of nicotine use.  During his hospitalization, Plaintiff's medications were adjusted and he was diagnosed with schizoaffective disorder, Asperger's disorder,

hypothyroidism, and a GAF of 30. Plaintiff's Master Treatment Plan noted that Plaintiff's liabilities included poor impulse control, lack of insight, threatening behavior, suicidal ideation, prior suicide attempts, poor communication with family, denial of responsibility, poor judgment, poor coping skills, and a lack of motivation. (Tr. 485-96, 507-31.)

Plaintiff was discharged on May 25, 2007. Plaintiff's discharge diagnosis was bipolar disorder and ADHD, Asperger's syndrome, and a GAF of 50. Dr. Anderson prescribed Concerta, trazodone, Synthroid, Celexa, Depakote, Invega, and Augmentin. At discharge, Plaintiff's parents felt that he could not safely return to their home, and after several unsuccessful attempts by a CenterPointe social worker to arrange for residential placement for Plaintiff, a Salvation Army facility agreed to accept Plaintiff, and his mother agreed to take him there. (Tr. 485-96, 507-31.)

On May 29, 2007, Plaintiff was re-admitted to CenterPointe Hospital with thoughts of suicide and violence. An intake reassessment stated that Plaintiff had attempted to drink cologne, and had surrendered a knife to his mother after confessing his intention to cut himself. Plaintiff also reported experiencing a craving for heroin. It was noted that after Plaintiff's last discharge, he went home and had initially done fairly well, but then became very withdrawn and dysphoric. During a psychosocial assessment of Plaintiff, Plaintiff attributed his suicidal ideation to his self-esteem issues, and believed his mood was the result of withdrawal from the use of illicit drugs. (Tr. 472-84, 498-506.)

Upon readmission, Gregory Mattingly, M.D. performed a psychiatric evaluation on Plaintiff, and noted a history of issues with developmental disabilities, severe problems with depression and paranoia, and infrequent hallucinations.  Dr. Mattingly diagnosed Plaintiff with schizoaffective disorder, pervasive developmental disorder, and a GAF of 35.  He also noted that Plaintiff's condition was complicated due to the intermittent use of marijuana and other illicit substances.  Dr. Mattingly recommended that Plaintiff be placed in a residential long term care treatment facility to stabilize his chronic issues.  (Tr. 503-04.)

Plaintiff was discharged on June 6, 2007, with a diagnosis of bipolar disorder, ADHD, Asperger's syndrome, and a GAF of 50.  (Tr. 498-99.)  On June 7, 2007, Plaintiff was transferred from CenterPointe Hospital's inpatient psychiatric unit to its acute outpatient program, because of the exacerbation of schizoaffective disorder symptoms, and suicidal ideation related to his drug abuse.  Pat O'Neil, L.C.S.W., noted that Plaintiff had a seven year history of polysubstance abuse of marijuana, as well as a history of using acid, ecstacy, opium, cocaine, and alcohol, sometimes daily.  Mr. O'Neil also noted that Plaintiff had been charged with drug possession, and had a pending court date.  At admission, Plaintiff was diagnosed with a GAF of 40.  (Tr. 533-47.)

While in the outpatient program, Plaintiff admitted to alcohol and opium use.  In group therapy, he needed constant redirection.  Plaintiff was discharged on June 27, 2007, at which time he reported decreased feelings of depression and anxiety; he was able to identify triggers to his cravings and depression, and to identify options to his self-

defeating behavior. However, Plaintiff resisted utilizing the 12-step program, and wanted to use willpower for his recovery. Plaintiff's discharge diagnosis was schizoaffective disorder, a history of polysubstance abuse, and a GAF of 55. Plaintiff's discharge medications included Invega, Celexa, Synthroid, Concerta, trazodone, and Depakote. (Tr. 533-47.)

Plaintiff and his father met with Dr. Anderson on July 9, 2007, and reported that Plaintiff had been "doing better" since Plaintiff's release from the hospital, but he was still "a little down." Dr. Anderson noted that residential placement was still being sought for Plaintiff. Plaintiff met with Dr. Anderson again on August 8, 2007, and reported feeling more stable, but anxious. Plaintiff stated he was going to weekly Narcotics Anonymous ("NA") meetings, working, and hoping to go back to school. (Tr. 466.)

Between October 17, 2007 and November 5, 2007, Plaintiff was admitted to Community Treatment, Inc. ("COMTREA") for its residential treatment program, because of his addiction to mood altering substances. While at COMTREA, Plaintiff participated in group and individual therapy sessions, and attended Alcoholics Anonymous ("AA") and NA meetings. Linda Boyer of the Department of Mental Health, conducted an assessment of Plaintiff, in conjunction with his admission to COMTREA. Ms. Boyer noted that Plaintiff reported periodic use of opium over the past year, smoking THC within the past 30 days, and smoking marijuana daily until his admission to COMTREA. Upon discharge, Plaintiff was diagnosed with cannabis dependence and a GAF of 45. (Tr. 548-75.)

On December 17, 2007, Dr. Anderson completed a Statement of Dependent Eligibility for United Healthcare, in which he indicated that Plaintiff suffered from bipolar disorder with psychosis, a history of violence, ADHD, and Asperger's syndrome. Dr. Anderson also diagnosed Plaintiff with a GAF of 40. Dr. Anderson stated that Plaintiff was "100% psychiatrically disabled", and "incapable of meaningful work in an open labor market." (Tr. 593.)

On February 1, 2008, Dr. Anderson noted that Plaintiff was doing well, and had a sponsor. Dr. Anderson also discontinued Plaintiff's use of Concerta, and started Plaintiff on Strattera. On May 2, 2008, Plaintiff saw Dr. Anderson, and reported that he had relapsed on marijuana and opium a week earlier, and had run out of his medications. (Tr. 591-92.)

**Evidentiary Hearing of July 15, 2008 (Tr. 5-44)**

Plaintiff, who was represented by counsel, alleged an amended disability onset date of January 1, 2006. Plaintiff testified that he was 21 years old, and had a high-school diploma. He stated that he did not know if he had been in a special education program, but had spent part of his day in an IEP during his last year of high school. He also testified that, due to behavioral problems, he had attended Evangelical Children's Home for a summer semester, as well as at least one regular semester. He had no problem reading and writing.

He had a valid driver's license, and worked as a delivery driver for Pizza Hut. He had worked for Pizza Hut for a year at $6.58 per hour, and his hours had just been

increased from 14 to 24 hours per week.

Plaintiff testified that most of his past jobs had been in the fast food business, and that he had worked at McDonald's and Imo's Pizza. He cooked and cleaned at these jobs, and at most had to lift and carry 50 to 60 pounds. He also worked the counter as a cashier for McDonald's. Plaintiff testified that he left jobs when school began, when he got into arguments with management, or when he had scheduling issues. Plaintiff stated that his bipolar disorder and schizophrenia limited his ability to work because the voices in his head were constantly telling him to do "pretty bad" and "messed up" things. His behavior had also caused him to lose jobs and lose hours. He explained that the voices in his head would convince him that things were happening, such as people talking about him behind his back, and even though nothing was actually occurring, he would react by becoming argumentative with people.

Plaintiff took Invega for his schizophrenia, as well as Strattera, trazodone, Depakote, and Citalopram for his bipolar disorder, ADHD, and manic depression. Plaintiff stated that trazodone made him sleep a lot, and that when he did not take Citalopram, he was so fatigued that he was unable to function during the day. He noted that overall he was able to function when taking his medication, but he heard voices despite his medication. He met with a counselor named Michelle Goldstein every other week, but he had not been to a session in a number of weeks. He testified that he took his medication as prescribed to him by Dr. Anderson, whom he saw "once every couple of months" for medication management. Plaintiff stated that he had been working part time

since submitting his application, and that he was living with his parents, but had briefly lived on his own, as part of a "drug free" group.

Plaintiff did not remember much about his last hospitalization and, as a result, he was unable to obtain the medical records for that hospitalization; however, he thought it occurred in November 2007, somewhere in Park Hills, Missouri. He also had been admitted to COMTREA for marijuana dependance from October 2007 to November 2007. Plaintiff testified that he had used marijuana intermittently for two years prior to COMTREA, but denied telling anyone at CenterPointe hospital that he was drinking daily. Plaintiff also denied the validity of hospital records stating that he had smoked marijuana for several years; had a history of acid, ecstacy, opium, cocaine, and alcohol abuse; and had first developed a substance abuse problem at age 14. Plaintiff stated that he had a relapse 58 days prior to the hearing and had used marijuana, but that it was the last time he had used any type of substance. He also smoked almost a pack of cigarettes per day. Plaintiff stated that he did not have any physical problems, and that his complaints were related to his mental health issues.

Plaintiff testified that he would take more hours if Pizza Hut would give them to him. His duties included delivering pizzas, prepping dough and sauces, and washing dishes. Plaintiff said that he got along with some, but not all, of his fellow employees, which was consistent with his general experience. He was "getting along better now" with the medication that Dr. Anderson had prescribed to him.

Upon questioning by his attorney, Plaintiff testified that he smoked marijuana

because, when he was high, he did not hear any voices in his head, other than his own thoughts, which made him feel safe. He stated that he had not used marijuana regularly since October 2007, when he was admitted to COMTREA, and estimated that he had used it approximately six or seven times since that time. He attended NA once a week, and had a sponsor. He said that Invega made the voices in his head easier to ignore, but did not take them away, and that the voices still told him to do "some pretty messed up things" to people around him. He had not yet had a medication that took the voices away completely.

Plaintiff testified that he used to cut himself when he did something wrong, both as a punishment and because it felt good, but he no longer cut himself. He had gotten a Continuous Positive Airway Pressure machine for his sleep apnea, and as a result, he slept approximately seven hours a night and woke up feeling rested. Plaintiff stated that even though he still had bad dreams about violent actions, he had far fewer such dreams than before he began taking medication. He saw his friends a couple times a week and got along well with them.

Dr. Anderson had diagnosed him with Asperger's syndrome and that it was part of the autism spectrum, but Plaintiff stated that while they had discussed it a few times, he did not remember what Dr. Anderson saw in him that suggested Asperger's syndrome.

When he was released from COMTREA, COMTREA referred him to the Church Army of Leadville, in Park Hills, Missouri, because it had a "drug free" group, and COMTREA was trying to help Plaintiff get off of marijuana. He lived on his own with

this group for a while, but stated that he now lived with his parents.

Plaintiff testified that his ADD had improved with medication, but he still had trouble focusing, and was distracted easily. He estimated that he could work for about 10 minutes before it became impossible for him to concentrate and, as a result, he was always switching from one thing to the next. Plaintiff said that he got yelled at "a lot" at work for not staying on task, and that he had only been given extra hours because they were pleased with his driving, not his other work.

Plaintiff also stated that he had trouble managing his impulse control and would say inappropriate things. The problem tended to arise everywhere and "at every bad moment you can imagine." His anger was the hardest to control, and it was particularly difficult to control at home and when he had to deal with authority figures, because he had trouble trusting or following authority figures. As a result, every time his boss told him to do something, he got angry "for no apparent reason at all." The two main reasons he felt that he could not work full-time were his trouble keeping attention and his trouble with anger.

Upon further questioning by the ALJ, Plaintiff testified that he no longer had a girlfriend. He felt he did the delivery job well and his employer was happy with the delivery aspects of his job. He felt the biggest problem he faced when delivering pizza was that he often delivered to places where he was offered drugs, and it was difficult to resist the temptation. Plaintiff attributed one of his relapses directly to a delivery he made for work, and stated that he had reported the matter to his boss and was almost fired

as a result.

Plaintiff testified that he was working on his anger issues with his counselor at Provident. He also stated that his past cutting of his forearms was not to get his parents' attention, but was because it felt good and was a means to punish himself.

The Vocational Expert ("VE") testified that Plaintiff's work history lacked any substantial gainful activity. He classified Plaintiff's jobs as a fast-food worker as unskilled jobs at the light exertional work level, though possibly more than light "once in a while." He also testified that Plaintiff's work as a delivery driver might have some element of semi-skilled, but was essentially a food preparation position, and therefore, an unskilled light job. In the VE's opinion, Plaintiff had no skills, no transferrable potential, and no past relevant work.

The VE testified that an individual of Plaintiff's age, education, and work experience, who had no exertional limitations, but who was limited to performing simple tasks, which required no more than occasional contact with the general public or co-workers, and who required extra access to supervision and help with both setting and meeting goals, could perform jobs such as product assembly jobs; hand pack, wrapping, and other types of bagger jobs; and product inspector, checker, and examiner jobs. Each of those jobs was available in both the local and national economies.

The VE then testified that an individual with the same criteria as above, but who also needed a job that would allow for occasional unscheduled interruptions of both the workday and the workweek, would be unable to sustain a job in the national economy,

because he would be unreliable to an employer.

Upon questioning by Plaintiff's attorney, the VE testified that the functional limitations associated with a GAF score of 50 were adopted by vocational experts as a cut-off point, and that the behaviors, stressors, and interactions associated with a GAF score below 50 were seen as inconsistent with maintaining employment due to instability, a variety or stress, interpersonal conflicts, a lack of reliable work, concentration, and pace. A GAF of 30 or 40 would indicate more severe versions of these symptoms.

**ALJ Decision of August 15, 2008** (Tr. 51-61.)

The ALJ found that Plaintiff met the insured status requirements for disability benefits through September 30, 2007. The ALJ next determined that Plaintiff had not engaged in substantial gainful activity since January 1, 2006, the alleged disability onset date. Plaintiff had "severe" impairments, as the term is defined in the Commissioner's regulations, with respect to a mental impairment variously described as bipolar disorder, Asperger's syndrome, personality disorder, schizoaffective disorder, and possible ADHD; and a history of polysubstance abuse. However, Plaintiff's "severe" impairments did not meet the severity level of a deemed-disabling impairment listed in the regulations.

The ALJ determined that Plaintiff had no more than a moderate restriction in activities in daily living; moderate difficulties in social functioning, concentration, persistence, or pace; and had only experienced one or two episodes of decompensation that were attributed to noncompliance with medication or to substance abuse; and therefore did not meet with the "B" criteria. He determined that Plaintiff had the RFC to

perform a full range of work at all exertional levels, but was limited to work involving no more than simple tasks which required no more than occasional contact with the general public or co-workers, and would need to work in an environment where he would be able to obtain additional supervision to help with both setting and meeting goals.

In support of his RFC assessment, the ALJ summarized Plaintiff's educational and medical records, and concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible because they were inconsistent with the RFC assessment. The ALJ stated that the evidence demonstrated that, when fully compliant with treatment recommendations, Plaintiff had functioned at a level that would not be expected to preclude work activity. He also noted that Plaintiff had been able to work part-time on an essentially ongoing basis since his alleged onset date, and noted that during an appointment with Dr. Anderson, Plaintiff stated that he wanted to work more hours, from which the ALJ inferred that even Plaintiff "believed he was capable of an increased workload."

The ALJ noted that Plaintiff's recent hospitalizations appeared to be due to Plaintiff's noncompliance with his medication, and not from "exacerbations occurring spontaneously despite adherence" to prescribed treatment. He also noted that Plaintiff's hospitalizations at CenterPointe Hospital in May 2007 and June 2007 appeared to have been directly linked to Plaintiff's increased use of illicit drugs. The ALJ cited to the fact that Plaintiff acknowledged a periodic use of opium, and that Plaintiff's problems and history were assessed as consistent with substance dependency, with marijuana as the

drug of choice. He determined that Plaintiff's drug use played a significant role in any symptom exacerbations experienced by Plaintiff.

The ALJ further noted that Plaintiff's hobbies, including fencing, martial arts, and playing video games, were not consistent with someone who had trouble with maintaining attention and concentration to the extent alleged by Plaintiff. He stated that based on the evidence, it seemed clear that Plaintiff was able to do anything he desired, and go anywhere he wanted, when he wanted, without any restrictions.

The ALJ stated that Plaintiff's poor earnings could reflect a lack of motivation, rather than an inability, to work full-time, particularly given that Plaintiff had limited daily expenses because he lived with his parents. He noted that one year of Supplemental Security Income would provide Plaintiff with far more income than he had ever earned during a single year while working, which could motivate him to exaggerate his symptoms. Plaintiff's earning record thus did not support the argument that, but for his alleged impairments, Plaintiff would be engaged in substantial gainful activity.

The ALJ did not afford Dr. Anderson's opinion controlling weight. He noted that Dr. Anderson's December 2007 report, in which he estimated that Plaintiff had a GAF of 40, and declared him to be "100% psychiatrically disabled and incapable of meaningful work in an open labor market," was inconsistent with his February 2008 statement that Plaintiff was "doing well." The ALJ further noted that Dr. Anderson's opinion that Plaintiff might not be able to work in a "competitive employment situation" was not a medical opinion, but an application of the statute, which was the task of the

Commissioner.  Moreover, the fact that Plaintiff had been continually performing meaningful work eroded the weight that Dr. Anderson's opinion would receive as a treating source.

The ALJ highlighted the fact that Plaintiff only saw Dr. Anderson once every two months for medication management, and noted that Dr. Anderson did not address Plaintiff's non-compliance with his treatment and medication, or with his substance abuse, and the effect compliance may have had on Plaintiff's ability to function.  He also noted that Plaintiff had a counselor, but admitted to not making all of his appointments.

The ALJ also contended that Dr. Anderson's opinion was not consistent with the overall evidence, and noted that others who treated Plaintiff did not see his limitations as so severe as to preclude work.  In particular, the ALJ noted Dr. Littleton's August 2006 assessment that Plaintiff appeared to be in an upbeat mood with a positive attitude and appropriate affect; had at least average cognitive capabilities with intact memory, reasonably good judgment, insight, and comprehension; and had an estimated GAF of 60, which was "indicative of only moderate difficulty with social or occupational functioning."

The ALJ did note that despite not affording Dr. Anderson's opinion controlling weight, he had considered Dr. Anderson's views in constructing Plaintiff's RFC.  He also considered the opinion of the Missouri State Agency medical consultant, which was consistent with the ALJ's decision and the overall record.

Finally, the ALJ noted that Plaintiff had no past relevant work.  Based on the VE's

testimony, the ALJ concluded that Plaintiff was capable of performing work as a product assembler, handpacker/bagger/wrapper, and product inspector/examiner/checker, all of which were available in the local and national economies, and that Plaintiff was therefore not disabled within the meaning of the Social Security Act.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits.

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The limitation in the first three functional areas is assigned a designation of either "none, mild, moderate, marked, [or] extreme." Id. § 404.1520a(c)(4). The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more." Id. When the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the area of decompensation, impairments are not

severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." Id. § 404.1520a(d)(1).

The ability to do basic work activities includes the abilities for understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. Id. § 404.1521(b).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work, if any. If the claimant can return to past relevant work, the claimant is not disabled. Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's

Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as depression, the Commissioner cannot carry the step-five burden by relying on the Guidelines, but must consider testimony of a vocational expert ("VE") as to the availability of jobs that a person with the claimant's profile could perform. Baker v. Barnhart, 457 F.3d 882, 888 n.2, 894-95 (8th Cir. 2006).

**Dr. Anderson's Opinion**

Plaintiff contends that the ALJ erred in discounting the opinion of Plaintiff's treating physician, Dr. Anderson. The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. §§ 404.1527(d), 416.927(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at § 404.1527(d)(2). A treating physician's opinion that is inconsistent with the physician's own treatment notes need not be credited by an ALJ. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).

The Court finds the ALJ's decision not to give Dr. Anderson's opinion controlling weight to be unsupported. In his decision, the ALJ stated that Dr. Anderson provided Plaintiff with "sporadic outpatient psychiatric treatment." A review of the record indicates that Dr. Anderson had been providing Plaintiff with psychiatric treatment approximately every two months, for over four years, which amounts to continuous, not "sporadic," treatment. Moreover, Dr. Anderson's treatment notes contain notations regarding Plaintiff's state of mind and activities, which indicate that Plaintiff's treatment was for more than "medication management only."

The ALJ also noted that evidence that Plaintiff had been "continually performing meaningful work, at least part time" eroded "much of the weight that would be given to Dr. Anderson's opinion as a treating source." However, Plaintiff never worked more than part-time, and always in various jobs in fast-food. He testified that his bipolar disorder and schizophrenia limited his ability to work because the voices in his head were constantly telling him to do "pretty bad" and "messed up" things, which caused him to lose jobs and lose hours, and that he got yelled at "a lot" at work for not staying on task. While he had been given extra hours at Pizza Hut, Plaintiff testified that was only because his supervisor was pleased with his driving, not his other work. Later in his decision, the ALJ noted that Plaintiff did not have past relevant work experience, which was consistent with the VE's opinion that Plaintiff's work history lacked any substantial gainful activity. This Court finds that the record does not support the ALJ's determination that Plaintiff's work history was composed of "meaningful work" to a

degree that fairly undermines the treating physician's opinion.

There may be valid reasons for questioning the medical opinion of Dr. Anderson with regard to Plaintiff's physical and mental limitations. But when viewing the record as a whole, the Court does not believe that the ALJ had an adequate basis to reject these opinions in favor of the opinion of the non-treating, state agency consultant, Dr. McGee.

Additionally, Dr. McGee's psychiatric review of Plaintiff, and Mental RFC assessment of Plaintiff, took place on August 31, 2006. Therefore, Dr. McGee's opinion did not take into account Plaintiff's December 30, 2006 admission to St. John's Mercy Medical Center for self-mutilation and exacerbation of his bipolar disorder, Plaintiff's May 10, 2007 admission to CenterPointe Hospital for threatening to take an overdose of pills and cut himself, Plaintiff's May 29, 2007 re-admission to CenterPointe Hospital with thoughts of suicide and violence, his multi-week stay in CenterPointe Hospital's acute outpatient program, or his admission to COMTREA's residential treatment program for substance abuse.

Furthermore, where, as here, an ALJ does not give controlling weight to the opinion of a treating source such as Dr. Anderson, but rather relies upon the opinion of a state agency consultant, the Commissioner's regulations require the ALJ to explain the weight given to the consultant. See 20 C.F.R. § 404.1527(f)(2)(ii). The ALJ's failure to do so here supports the Court's decision that the Commissioner's decision must be reversed and the case remanded. See Willcockson v. Astrue, No. 07-3757, 2008 WL 3927277, at *2 (8th Cir. Aug. 28, 2008) (reversing and remanding for further

consideration where the ALJ did not explain why he relied on the RFC assessment of a state agency consultant; "By explaining the weight given [the consultant's] assessment, the ALJ would have both complied with the regulation and assisted [the Court] in reviewing the decision.").

In sum, the Court recognizes that it is generally for the ALJ to assess the record and determine the weight to be accorded to the treating physician's opinions, and that a court should "disturb the ALJ's decision only if it falls outside the available 'zone of choice.'" See, e.g., Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) (citations omitted). But, while the question might be close, the Court believes that reversal and remand are required here. See Willcockson, 2008 WL 3927277, at *3 ("Several errors and uncertainties in the [ALJ's] opinion, that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying [the Plaintiff's] claims to require further proceedings . . . .").

The Court will reverse and remand this case for further consideration, and with the instruction that any determination of no disability be supported by further explanation of the weight given to the opinions of Dr. Anderson and Dr. McGee.

**Plaintiff's RFC and Credibility**

In light of the Court's remand of this case for further consideration of the weight to be given to the opinions of Dr. Anderson and Dr. McGee, the ALJ will need to perform a new RFC assessment of Plaintiff. Therefore, the Court will not address Plaintiff's arguments regarding the ALJ's assessment of Plaintiff's RFC or his credibility.

## CONCLUSION

In sum, the Court finds that the ALJ's decision is not supported by substantial evidence. On remand, the ALJ should give proper weight to the opinion of Dr. Anderson, or more thoroughly articulate his reasoning for discounting it. The ALJ should also give proper weight to the opinion of Dr. McGee, or explain the weight given to the opinion of Dr. McGee. Finally, the ALJ should reconsider Plaintiff's RFC, which might require further development of the record.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** for further proceedings.


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 24th day of September, 2010.